COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                        NO.
2-06-345-CV

 

 

IN THE INTEREST OF                                                                            

T.J.R.,
A CHILD

                                                    

                                                                                                        

 

                                              ------------

 

           FROM
THE 323RD DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM
OPINION[1]

 

                                              ------------

Appellant Natasha Davis
appeals the termination of her parental rights to T.J.R.,[2]
arguing that the evidence was legally and factually insufficient to sustain the
trial court=s best
interest finding.  We affirm.

 








BACKGROUND

T.J.R. was born on December
12, 2003.  Between September 2004 and
September 2005, Child Protective Services (ACPS@) received
several referrals on Appellant involving drug use and neglectful supervision;
the September 2004 investigation Awas ruled out with factors controlled.@[3]  CPS was initially unable to
investigate an April 2005 referral because it could not locate Appellant.  After Appellant=s arrest on drug charges in September 2005, CPS workers used the homes
listed on Appellant=s jail sheet
to locate her.  Appellant had been living
with her husband=s relatives;[4]
these relatives Ahad CPS
histories.@  The State made an emergency removal of T.J.R.








Appellant started using drugs
at age seventeen.  She was twenty-five
years old at trial and had been drug free for approximately two months at the
time of the termination trial.[5]  She also had a criminal history involving
drug and theft offenses.  The trial court
terminated Appellant=s parental
rights based on child endangerment and the child=s best interest.  See Tex. Fam. Code Ann. ' 161.001(1)(D)-(E), (2) (Vernon Supp. 2006).  Although requested by Appellant, the trial
court did not file findings of fact and conclusions of law.

SUFFICIENCY OF THE EVIDENCE

Appellant claims that the
evidence was not legally or factually sufficient to support the trial court=s best interest finding because she has turned her life around, has Avirtually completed her service plan,@ and has demonstrated significant improvement.  The State counters that the evidence was
sufficient because Appellant had a long history of drug abuse and unemployment,
was unable to provide a stable home or financial support for the child, had a
criminal history, and was incarcerated at the time of trial.








A parent=s rights to Athe
companionship, care, custody, and management@ of his or her children are constitutional interests Afar more precious than any property right.@  Santosky v. Kramer, 455
U.S. 745, 758‑59, 102 S. Ct. 1388, 1397 (1982); In re M.S., 115
S.W.3d 534, 547 (Tex. 2003).  AWhile parental rights are of constitutional magnitude, they are not
absolute.  Just as it is imperative for
courts to recognize the constitutional underpinnings of the parent‑child
relationship, it is also essential that emotional and physical interests of the
child not be sacrificed merely to preserve that right.@  In re C.H., 89 S.W.3d
17, 26 (Tex. 2002).  In a termination
case, the State seeks not just to limit parental rights but to end them
permanentlyCto divest
the parent and child of all legal rights, privileges, duties, and powers
normally existing between them, except for the child=s right to inherit.  Tex. Fam. Code Ann. ' 161.206(b) (Vernon Supp. 2006); Holick v. Smith, 685 S.W.2d
18, 20 (Tex. 1985).  We strictly
scrutinize termination proceedings and strictly construe involuntary
termination statutes in favor of the parent. 
Holick, 685 S.W.2d at 20‑21; In re E.S.S., 131
S.W.3d 632, 636 (Tex. App.CFort Worth 2004, no pet.).








In proceedings to terminate
the parent‑child relationship brought under section 161.001 of the family
code, the petitioner must establish one ground listed under subdivision (1) of
the statute and must also prove that termination is in the best interest of the
child.  Tex.
Fam. Code Ann. ' 161.001; In
re J.L., 163 S.W.3d 79, 84 (Tex. 2005). 
Both elements must be established; termination may not be based solely
on the best interest of the child as determined by the trier of fact.  Tex. Dep=t of Human Servs. v. Boyd, 727 S.W.2d
531, 533 (Tex. 1987).  Appellant does not
appeal the trial court=s
endangerment findings under section 161.001(1). 
See Tex. Fam. Code Ann. ' 161.001(1).

In a trial to the court, as
here, where no findings of fact or conclusions of law are filed, the trial
court=s judgment implies all findings of fact necessary to support it.  Pharo v. Chambers County, 922 S.W.2d
945, 948 (Tex. 1996).  Where a reporter=s record is filed, however, as in this case, these implied findings
are not conclusive, and Appellant may challenge them by raising both legal and
factual sufficiency of the evidence points. 
Where such points are raised, the applicable standard of review is the
same as that to be applied in the review of jury findings or a trial court=s findings of fact.  Roberson
v. Robinson, 768 S.W.2d 280, 281 (Tex. 1989).








Termination of parental
rights is a drastic remedy and is of such weight and gravity that due process
requires the petitioner to justify termination by clear and convincing
evidence.  Tex. Fam. Code Ann. '' 161.001, 161.206(a); In re J.F.C., 96 S.W.3d 256, 263 (Tex.
2002).  This intermediate standard falls
between the preponderance standard of ordinary civil proceedings and the
reasonable doubt standard of criminal proceedings.  In re G.M., 596 S.W.2d 846, 847 (Tex.
1980); In re K.W., 138 S.W.3d 420, 425 (Tex. App.CFort Worth 2004, pet. denied). 
It is defined as the Ameasure or degree of proof that will produce in the mind of the trier
of fact a firm belief or conviction as to the truth of the allegations sought
to be established.@  Tex.
Fam. Code Ann. ' 101.007
(Vernon 2002).

The higher burden of proof in
termination cases elevates the appellate standard of legal sufficiency
review.  J.F.C., 96 S.W.3d at
265.  The traditional no‑evidence
standard does not adequately protect the parent>s constitutional interests.  Id.  In reviewing the evidence for legal
sufficiency in parental termination cases, we must determine whether the
evidence is such that a factfinder could reasonably form a firm belief or
conviction that the grounds for termination were proven.  Id. at 265‑66.  We must review all the evidence in the light
most favorable to the finding and judgment. 
Id. at 266.  This means
that we must assume that the factfinder resolved any disputed facts in favor of
its finding if a reasonable factfinder could have done so.  Id. 
We must also disregard all evidence that a reasonable factfinder could
have disbelieved.  Id.  We must consider, however, undisputed
evidence even if it is contrary to the finding. 
Id.  That is, we must
consider evidence favorable to termination if a reasonable factfinder could,
and disregard contrary evidence unless a reasonable factfinder could not.  City of Keller v. Wilson, 168 S.W.3d
802, 827 (Tex. 2005).








This higher burden of proof
also elevates the appellate standard of factual sufficiency review.  C.H., 89 S.W.3d at 25.  A[A] finding that must be based on clear and convincing evidence cannot
be viewed on appeal the same as one that may be sustained on a mere preponderance.@  Id.  In considering whether the evidence of
termination rises to the level of being clear and convincing, we must determine
whether the evidence is such that a factfinder could reasonably form a firm belief
or conviction that the grounds for termination were proven.  Id. 
Our inquiry here is whether, on the entire record, a factfinder could
reasonably form a firm conviction or belief that the termination of the parent=s parental rights would be in the best interest of the child.  Id. at 28.








The distinction between legal
and factual sufficiency lies in how we review the evidence.  J.F.C., 96 S.W.3d at 266.  In a factual sufficiency review, in
determining whether the evidence is such that a factfinder could reasonably
form a firm belief or conviction that its finding was true, we must consider
whether disputed evidence is such that a reasonable factfinder could not have
resolved it in favor of the finding.  Id.  If, in light of the entire record, the
disputed evidence that a reasonable factfinder could not have credited in favor
of the finding is so significant that a factfinder could not reasonably have
formed a firm belief or conviction in the truth of its finding, then the
evidence is factually insufficient.  Id.  If we reverse on factual sufficiency grounds,
then we must detail in our opinion why we have concluded that a reasonable
factfinder could not have credited disputed evidence in favor of its finding.  Id. at 266‑67.

Nonexclusive factors that the
trier of fact in a termination case may use in determining the best interest of
the child include the child=s desire; the child=s emotional and physical needs, and the emotional and physical danger
to the child, now and in the future; the parental abilities of the individuals
seeking custody; the programs available to assist these individuals to promote
the best interest of the child; the plans for the child by these individuals or
by the agency seeking custody; the stability of the home or proposed placement;
the acts or omissions of the parent which may indicate that the existing parent‑child
relationship is not a proper one; and any excuse for the acts or omissions of
the parent.  Holley v. Adams, 544
S.W.2d 367, 371‑72 (Tex. 1976).








These factors are not
exhaustive; some listed factors may be inapplicable to some cases; other
factors not on the list may also be considered when appropriate.  C.H., 89 S.W.3d at 27.  Evidence of a parent=s long-term drug use and unstable lifestyle supports a finding that
termination is in the best interest of the child, as does her inability to
provide a stable home and remain gainfully employed, to successfully complete
drug treatment, and to comply with her family service plan.  In re D.S., 176 S.W.3d 873, 879 (Tex.
App.CFort Worth 2005, no pet.).  A
trial court may also consider incarceration as a best interest factor.  In re J.B.W., 99 S.W.3d 218, 229 (Tex.
App.CFort Worth 2003, pet. denied). 
Furthermore, undisputed evidence of just one factor may be sufficient in
a particular case to support a finding that termination is in the best interest
of the children.  C.H., 89 S.W.3d
at 27.  On the other hand, the presence
of scant evidence relevant to each Holley factor will not support such a
finding.  Id.

T.J.R.=s Emotional & Physical Needs, Present & Future

T.J.R. was not at trial and
could not indicate his desires.  Katrina
Mack, the CPS worker, testified that T.J.R. was healthy and that Appellant appeared
to be bonded with him.  However, Mack
indicated that she did not feel that it would be in T.J.R.=s best interest to return to a family setting with Appellant because,
based on working directly with Appellant and Appellant=s previous drug-use history, Ait just seems like there is a spiraling effect in regards to the ups
and downs in her life and how she handles those challenges.@  Mack testified that T.J.R. was
doing well with his foster family, with whom he had lived for over a year at
the time of trial.








Appellant testified that
between T.J.R.=s birth and
the removal she had been able to keep him fed and clothed and that he Anever went without anything.@  She claimed that T.J.R. had
never been exposed to her drug use. She also testified that she had not been
able to find a job and that she and her husband had been living with her
husband=s mother for around a year.  She
said that she could take care of T.J.R. but that it would be a financial
struggle.  She did not know how much
money her husband earned from working for his mother or what their monthly
expenses were.

Susanne Edwards, T.J.R.=s foster mother, testified about a typical day for T.J.R. with her
family.  He goes with Edwards twice a
week when she works for Mother=s Day Out.  Edwards said that
T.J.R. and her ten-year-old biological son share a bedroom and that they love
each other.[6]  They have plans to move into a larger
home.  She testified that her family was
able to financially care for T.J.R. and that they want to adopt him.  She said, AI know biologically, he=s not mine, but he feels like he=s mine,@ and that he
is part of their family.  Two photos of
T.J.R. with the foster family at Christmas were admitted as exhibits.

 

 








Emotional & Physical Danger, Present
& Future 

Appellant argues that when
this case was called for trial, she had Ain effect@ stayed
drug-free for nearly nine months. 
Appellant does not discuss her criminal history in her brief or mention
that when the termination trial began, in September 2006, she had a pending
theft case for shoplifting and was incarcerated for theft during the course of
the termination trial.[7]

Appellant=s convictions for theft and drug offenses were introduced at
trial.  She pled guilty and was convicted
of possession of a controlled substance by fraud in 2001 and received a
suspended two-year sentence and community supervision.  She pled guilty to misdemeanor theft in 2002
and received 170 days=
confinement.  In 2003, she pled guilty to
misdemeanor theft by check and received thirty days= confinement.  That same year,
she pled guilty to possession of heroin, less than one gram, and received
ninety days=
confinement.  She testified that she
discovered that she was pregnant with T.J.R. when she went to jail after that
arrest.  She admitted that she used
heroin before learning she was pregnant with T.J.R.








Officer Rusty Wingate
testified that he made a traffic stop of Appellant and her husband in September
2005 for no inspection sticker and because a small child, identified by
Appellant as her son, was standing up in the back seat without a
restraint.  After a consent search of the
vehicle, Officer Wingate found a Asmall plastic baggie containing a white powdery substance@ in the passenger floor board area. 
He testified that Appellant called it meth and that she claimed it and
told him that it had been given to her by a coworker at the strip club where
she worked.  He also testified that when
they arrived at the jail and Appellant exited the patrol unit, a used syringe
fell from underneath her shorts onto the ground.








Officer Wingate said that
when he asked her if she had any more, she said, Ayes,@ and raised
her shirt to expose a plastic bag containing five more needles.  The hospital medical records from a body
search of Appellant in the same incident were admitted and indicated that a Adime bag@ of
methamphetamine had been discovered in her rectum.  Appellant contested this, stating, AIt wasn=t a dime bag
and they didn=t find it in
my rectum.@  When asked how many times in her whole life
she had used drugs, Appellant responded, AAt different times in my life I had what I=d consider a drug habit to where I had to use every day, and I have
had periods of clean time as well.@      After T.J.R.=s removal, Appellant testified that she and her husband used heroin on
a daily basis for three months. 
Appellant and her husband began drug treatment in December 2005;
Appellant testified that entering treatment was voluntary and not part of her
service plan.  She was discharged from
the seven-day methadone[8]
detoxification program that she entered in March 2006 after only four days
because the clinic staff found a syringe in her pillowcase and a baggie with
drug residue in her brassiere.  Appellant
admitted that these items were hers, but said that she thought she and her husband
had thrown away all of their drug-related paraphernalia and when she found
these items in the bottom of one of her shoes that she had packed, she panicked
and tried to hide them.  She testified
that she had been to the hospital emergency room for drug overdoses twice, once
after her sister=s death in
September 2004.

After a hair sample from
Appellant was sent for a drug screening in June 2006 and tested positive for
cocaine metabolite, the State decided to seek termination of her parental
rights.

Parental Abilities & Programs 








Appellant argues that she and
her husband attended the parenting course and completed psychological
evaluations, and that Appellant underwent random substance abuse evaluations
and tested clean with the exception of the June 2006 test.  Appellant contends that she failed that drug
test only because she was mistakenly told by CPS that T.J.R. would be placed
with one of her relatives in Colorado. 
She testified that she has been off of methadone since the middle of
July and that she went to Narcotics Anonymous (ANA@) meetings
two to three times a week and Community Addiction Treatment Services (ACATS@) once a
week on Wednesdays.  However, she
admitted that she stopped going in July, and that A[a]bout the time I stopped going to my visits with my son is pretty
much the time I stopped doing anything else like my one-on-one counseling, I
went to one of those appointments and stopped going to those.  It all kind of stopped at one time.@  She testified that she did not
have a sponsor in her NA group.  She said
that after the positive drug test, when Mack told her that there was a good
chance her parental rights would be terminated, she Aquit doing a lot of the things that they were asking me to do.@       The assistant district
attorney asked Appellant whether she realized that when she used the cocaine
that summer that she was putting her parental rights at risk.  Appellant said, Ano,@ but then
responded affirmatively to a follow-up question about whether CPS had asked her
Ato stay clean in order for [her] to get [her] child back.@








Mack agreed that Appellant
had completed her service plan Afor the most part.@  However, Appellant missed
scheduled visitations and, in July, failed to return Mack=s phone calls to the point that Mack went to Appellant=s house and wrote on the back of one of her cards that she desperately
needed to contact Appellant, when Appellant had not been in touch for seven or
eight days.

Appellant testified that she
missed visits with T.J.R. because of some personal problems with her marriage,
which kept her from complying with some of the things CPS had asked her to
do.  She said that she did not contact
Mack to let Mack know that she was having problems and could not make the
visits. She said that her mother-in-law did mention that there was a message
from a caseworker that had been out to her house, trying to contact her, but
that she was focused at the time on A[c]oming off methadone and some personal issues [she had] had with
[her] husband and [their] marriage.@  Mack testified that she had
had no contact with Appellant since July.

Plans For T.J.R. & Stability Of The Home

The State=s plan at trial was to try to allow T.J.R.=s foster family to adopt him. 
Edwards testified that her family wants to adopt him and that her family
would be committed to taking any type of class the State asked them to so that
T.J.R. could be permanently placed with them.








When asked whether she
believed she was ready to care for T.J.R., Appellant responded, AI can=t say that I=m ready to care for T.J.R. right now.@ She said her plan for him was to keep him in her family and not in
foster care and that she had family members who were willing to help out.  There was testimony at trial that Appellant=s father or other family members might be placement possibilities for
T.J.R.  Mack testified that CPS had Aa full write-up in regards to the father=s unwillingness to accept [T.J.R.] in his home@ at the time Appellant=s Colorado relative was being considered.  She testified that CPS had not done a home
study on Appellant=s father.

Appellant=s Additional Arguments

Appellant refers us to In
re W.C. for the proposition that Athe best interest determination must have a firm factual basis apart
from the >offending= behavior,@ and asserts
that evidence of past conduct may not support the best interest finding when
the parent has more recently demonstrated positive changes in her life.  In re W.C., 98 S.W.3d 753, 765-66
(Tex. App.CFort Worth
2003, no pet.).  We did note in W.C.
that, while quite often the child=s best interest is infused with the statutory offensive behavior,
there are cases in which the best interest determination must have a firm basis
in facts standing apart from the offending behavior.  Id. at 758.  This, however, is not one of those cases.








W.C., like this case, was an endangerment termination and addressed the
factual sufficiency of the evidence to support the best interest finding.  Id. at 757-58.  However, in W.C., the mother had
successfully completed her service plan and had made significant progress
under those services in that she made the recommended improvements and changes
in her life and in her family relationships, she and the children were bonded,
she visited her children regularly, and she demonstrated that she had gained a
good support system through her family and church.  Id. at 766.  Also, in W.C., the primary danger to
the children came from the mother=s relationships with abusers and her trouble supervising the children
alone, not from the mother herself.  Id.
at 758, 761.








Here, although Appellant had
made some progress and had bonded with her son, she stopped visiting
T.J.R. in July and testified that her marital problems kept her from following
CPS=s plans around the same time. 
In contrast to the mother in W.C., the danger to T.J.R. comes
from Appellant=s own drug
abuse and criminal activities.  The
mother in W.C. did everything the Department required of her except pay
child support; we concluded that there was nothing more she could have done to
have her children returned to her.  Id.
at 765‑66.  Appellant failed to fully
complete her service plan and stopped her visits and NA and CATS meetings when
Mack informed her that the Department planned to seek termination based on the
positive results of the June 2006 drug test. 
Her situation is unlike that of W.C.=s mother.  Contra W.C.,
98 S.W.3d at 758.

Looking at all of the
evidence in the light most favorable to the best interest finding, we hold that
a reasonable trier of fact could have formed a firm belief or conviction that
its finding was true.  See J.F.C.,
96 S.W.3d at 266; In re J.T.G., 121 S.W.3d 117,124‑25 (Tex. App.CFort Worth 2003, no pet.). 
Additionally, giving due consideration to evidence that the factfinder
could have found to be clear and convincing, and based on our review of the
entire record, we hold that a reasonable trier of fact could have formed a firm
belief or conviction that the termination of Appellant=s parental rights would be in T.J.R.=s best interest.  See C.H.,
89 S.W.3d at 25.  Accordingly, we hold
that the evidence was legally and factually sufficient to support the trial
court=s best interest finding.  We
overrule both of Appellant=s issues.

CONCLUSION

Having overruled Appellant=s first and second issues, we affirm the trial court=s order terminating Appellant=s parental rights to T.J.R.

 

PER CURIAM

PANEL F: 
HOLMAN, J; CAYCE, C.J.; and MCCOY, J.

DELIVERED: 
March 1, 2007











[1]See Tex.
R. App. P. 47.4.





[2]We identify the child by initials
only.  See Tex. Fam. Code Ann. ' 109.002(d) (Vernon 2002).





[3]The September 2004 referral involved
a drug overdose by Appellant. Appellant testified that she had been to the
hospital emergency room for a drug overdose in September 2004.  CPS received other referrals while the April
2005 investigation was open, involving neglectful supervision of T.J.R. and
ongoing drug use by Appellant and her husband, as well as reports that they
were staying in homes with no electricity or food.





[4]Appellant=s husband, Brian Davis, is not
T.J.R.=s biological father. Appellant
indicated that she was unsure who, of a few possibilities, was T.J.R.=s actual biological father, but she
testified that Davis is the only father that T.J.R. has ever known.





[5]The trial was in September
2006.  The testimony at trial is unclear
regarding when Appellant used cocaine, although it is uncontested that she did;
it was either in June or July 2006.





[6]In contrast, Appellant has a
daughter who is a year older than T.J.R. and who has lived with Athe grandparents@ since she was two years= old.  Appellant testified that she, her father, and
the paternal grandparents have a joint managing conservatorship over the
daughter and that Appellant has visitation once or twice a month at Appellant=s father=s house.  There was no testimony on whether T.J.R. has
ever interacted with his half‑sister.





[7]Appellant indicated that she would
be in jail for that offense for a total of forty days, because although the
sentence was for 120 days, she was Agetting trusty time, so that=s three-for-one, so it comes to 40
days.@ 
Her testimony indicated that she committed the offense within a week or
two after T.J.R. was removed from her.





[8]Methadone is an addictive opiate
used by heroin addicts as a heroin substitute. 
Appellant went into drug rehabilitation in March 2006 because she was
addicted to methadone.